Roberto Enrique Fontes
FULL NAME
Cell #11 d8 Inmate # 1308340722
COMMITTED NAME (if different)
West Valley Detention Center
FULL ADDRESS INCLUDING NAME OF INSTITUTION
9500 Etiwanda Ave
Rancho Cucamonga , Ca 91739
PRISON NUMBER (if applicable)
#1308340722

TO:
ATTENTION: Pro se Clerk and Judge
United States District Court
Central District of California
312 North Spring Street, Room G-8
Los Angeles,

FILED
CLERK, U.S. DISTRICT COURT
FEB - 9 2016
CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

CASE NUMBER
EDCV 16 00247 - JGB (FFM)

To be supplied by the Clerk

Roberto Enrique Fontes

PLAINTIFF,

v.

San Bernardino County Sheriffs
Dept, West Valley Detention Center,
and Medical Staff

DEFENDANT(S).

LODGED
CLERK, U.S. DISTRICT COURT
FEB - 8 2016
CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

# CIVIL RIGHTS COMPLAINT
# PURSUANT TO (Check one)

☑ 42 U.S.C. § 1983
☐ Bivens v. Six Unknown Agents 403 U.S. 388 (1971)

## A. PREVIOUS LAWSUITS

1. Have you brought any other lawsuits in a federal court while a prisoner: ☑ Yes   ☐ No

2. If your answer to "1." is yes, how many?  One lawsuit enclosed with this one.

Describe the lawsuit in the space below. (If there is more than one lawsuit, describe the additional lawsuits on an attached piece of paper using the same outline.)

Lawsuit #(1) Medical Claim (Negligence.) The Reason I am Following this Lawsuit is due to gross negligence of the Medical Staff Not Following the proper guidelines of Medical Attention That is Needed I came to West Valley Detention Center in August of 2013. and was scheduled For a Colonoscopy the Following year 2014 (March). The Medical Staff did not adhere to My Requests to Be Taken To Arrowhead Regional Medical Center in The City of Colton. In which I suffered Blockage of my Colon (Rectum), which had 3 developed polyps during the period From March 2014 to previous Time. However, after a year and a Half After entering the West Valley Detention Center my situation Had Worsened and Now I have damaged lining of my Colon and a Couple of Continuous (polyps) problems That are Border-line Cancerous. It is Now permanently damaged and I would Ask For the Magistrate (Honorable Judge.) To grant Monetary relief due to the Fact That I Now have, to Worry about the Cancer which is Mental Anguish to Me everyday. Also under The A.D.A disability Act guidelines The Medical Staff Has to follow proper Procedures For patients (Inmates.) whether Mental or Medical Needs. Continued on Seperate page 1 of 1.

Also the Medical grievance is Not Sound enough to explain How to go about seeking Medical Attention or Needs. All they tell us is to Fill out a Medical request And when they do see us, They (Doctors, Staff, etc...) do Not Listen to the request That Are Being Made. Especially in A Situation where Cancer is Concerned with polyps And the Colon. During 2014 and 2015. Ive tried Many Several requests and told the Medical Staff, Doctors and Nurses That I Had problems in my Colon; I also Have graves disease which is a very Hyper Thyroidism And it makes my Heart And Metabolism speed up at a Fast Rate. So Eventually they (Doctors) Had to give me Nuclear BioMedicine to try And Kill my Thyroid to bring my physical problems back to Normal, But Now Im stuck without the proper thyroid Glands And Have to take Medicine For the rest of my Life. I Also Asked For Several Cat Scans And testing on my Liver to Find out about my Cyst (small Ball Growth), In which one Doctor Said that it was possibly Cancerous, But Needs to Have Biopsies done to the liver to properly diagnose the Cyst. I Also Have my Eyes getting Worse with Macular degenerative disease. I Tried explaining to the eye doctor that I Had Laser Surgery on Both eyes And when I got incarcerated the doctors did not Follow up with the prescribed Bottles of Medication ① 1 Bottle For Healing the eyes. and 1 Bottle For Antibiotic Care. I Also Tried getting my regular prescription glasses And told them (Eye Doctors.) That I Needed a New prescription due to Not getting enough Sunlight Since my Cell Window Has been Frosted in which lets No Sunshine In. So Me and my Cellmate Cannot Look out

And recieve the proper Sunlight (Vitamins, Nuttrents Etc.)
I was also Covered with Medical Insurance AT THE Same
Hospital at Arrowhead Regional Medical Center. You
Would think that they would Continue to let us/me
Inmates to use our existing Medical Insurence AND
Doctors, For all our Medical Needs during time oF
Incarceration.

Dear, Honorable Magistrate Judge and Pro Se Clerk 12/24/.
Hi my name is Roberto Enrique Fontes and I
pray this letter reaches you in the Best of Health and
spirits, The reason I am filing both these lawsuits
is due to the fact that there Has been some seriou
issues relating to my incarceration at first I felt
that things would get better, but only got worse.
somehow life Has a way of becoming a roller
coaster not Knowing the future. My whole life
Ive seen the Bad and Good in all areas and
lived overseas in South America and the Carribea
and in several other states. Served in the United
States Marine Corps and a son of a Special Force
Green Beret for 30 years (ES Fontes/Father). So pret
much I know the difference between right or
Wrong, but Somehow find myself in a period of
conviction and Rehabilitation both physically and
spiritually. I'm convinced that God Has a plan
for everyone. I Have three young adults in
their 20's and two Grandkids, I just ask that
you consider my 2 claims (medical and sexual
abuse.) I feel that these are serious issues th
linger on my mind and future. Can you plea
Help me with an attorney/counsel, Because there
are other related issues I need to talk
about, But don't know where to turn to! (due
to fear) I pray you would Help me in
this Matter and wiegh the scales of

Justice accordingly. I am not on this Earth to
become a rich man, because we can't take
it with us when we die. But there are some
serious problems that are going on in this
Facility / County, which need to be corrected.
Thank you for your Concern, Time and patience!

God Bless, Sincerely

Psalm 121

Roberto Enfontes
11 d 8 1308340722
W.V.D.C
9500 Etiwanda Ave
Rancho Cucamonga, CA
91739.


P.S. There are 3 Copies of the Medical Claim
There are 3 Copies of The Sexual claim.
There are 3 Copies of the Account statements
Request To proceed without prepayment of
Filing Fees with Declaration is Support.
* also I would like to Have an appointment
of Counsel, under Forma pauperis provisions
(28 U.S.C.A sec. 1915 (d), 69 A.L.R. Fed 666





PRISON LAW OFFICE
General Delivery, San Quentin, CA 94964-0001
Telephone (510) 280-2621 • Fax (510) 280-2704
www.prisonlaw.com

*Director:*
Donald Specter

*Managing Attorney:*
Sara Norman

*Staff Attorneys:*
Rana Anabtawi
Rebekah Evenson
Steven Fama
Penny Godbold
Alison Hardy
Corene Kendrick
Kelly Knapp
Millard Murphy
Lynn Wu

3/5/2015

Roberto Fontes, 1308340722
San Bernardino
9500 Etiwanda Ave
Rancho Cucamonga, CA 91739

Dear Mr. Fontes:

We hope this letter finds you well. Thank you for taking the time to speak with attorney Rana Anabtawi on 2/26/15 regarding your concerns at San Bernardino County Jail. The information you provided will help us as we continue to monitor conditions at the Jail.

At this time, our office is trying to negotiate an agreement with County officials to fix the problems we have found at the Jail in the areas of medical, mental health, and dental care; disability discrimination; use of force; and prisoner safety. As part of these negotiations, we met with the County's attorney on 2/27/15. During the meeting, we discussed the type of problems you and other inmates reported during our interviews on 2/26/15. The County's attorney agreed that many of the inmates' allegations are concerning, and should be explored further. We will continue to meet with County officials about possible solutions to the problems. Unfortunately, this process will move slowly because the problems are complicated, and we need to build a relationship of mutual trust with the County in order to be able to negotiate effectively. That being said, we believe this negotiation process will result in faster and better solutions than if we sued the County and relied solely on the Court to make certain orders.

Please keep us updated regarding any concerns you have at the Jail. Additionally, please write to us if you experience any retaliation as a result of speaking with us on 2/26/15. If you do experience retaliation, please give us as many details as you can regarding the retaliation (e.g., dates, times, names, locations, etc.), and why you feel these actions were retaliatory.

Additionally, we enclose information regarding Graves' Disease and colon cancer, per your request. We hope you find it helpful.

We wish you the best. Take care.

Sincerely,

Viviana Arcia
Litigation Assistant under Rana Anabtawi

Enclosures: SASE; Information on Graves' Disease, Colon Cancer

Board of Directors
Penelope Cooper, President • Michele WalkinHawk, Vice President • Marshall Krause, Treasurer
Christiane Hipps • Margaret Johns
Cesar Lagleva • Laura Magnani • Michael Marcum • Ruth Morgan • Dennis Roberts



PRISON LAW OFFICE
General Delivery, San Quentin, CA 94964
Telephone (510) 280-2621 • Fax (510) 280-2704
www.prisonlaw.com

*Director:*
Donald Specter

*Managing Attorney:*
Sara Norman

*Staff Attorneys:*
Rana Anabtawi
Rebekah Evenson
Steven Fama
Warren George
Penny Godbold
Alison Hardy
Corene Kendrick
Kelly Knapp
Millard Murphy
Lynn Wu

San Bernardino Case Update (November 2015)

Dear Sir or Madam:

The Prison Law Office is a non-profit law office representing adults and juveniles in California in cases about prison and jail conditions. Over the last several months, we have looked at conditions in the San Bernardino Jails. We found problems with medical care, mental health care, dental care, disability accommodations, use of force, and inmate-on-inmate violence.

We have been meeting with the Sheriff and County officials about the problems we found. We told them that they could agree to work with us to fix the problems, or we would file a class action lawsuit. The Sheriff and County officials have agreed to work with us to fix the problems we identified, and we are in the process of negotiating a written agreement to fix those problems. We have recently made good progress in these negotiations. However, if the County will not sign a written agreement that is acceptable to us, we will go to court about the problems. If the County signs the agreement, and then does not follow it, we will also go to court about the problems. We are hopeful that the problems will be fixed much faster through this process than if we spent several years in court fighting against the County. We are sending you an article from The Sun that explains a little bit more about the negotiations.

We are not representing inmates in a class action lawsuit about waist chains.

We are sorry that we do not have the resources to represent you in an individual lawsuit or to help you with your individual problem. We urge you to turn in a grievance to try to fix any problems you are having. To preserve your right to file a lawsuit in court in the future, you must turn in a grievance. Please be sure to keep copies of your grievances and any responses. Please also make sure you go through all three levels of the grievance process and receive a response from the Facility Commander.

We are also sorry that we do not know any attorneys who will take your individual case. If you would like self-help information about how to file a lawsuit on your own, please write back to us and ask for that information.

Sincerely,

*Kelly Knapp*

Encl:  10/13/14 News Article

Board of Directors
Penelope Cooper, President • Michele WalkinHawk, Vice President
Marshall Krause, Treasurer • Christiane Hipps • Margaret Johns
Cesar Lagleva • Laura Magnani • Michael Marcum • Ruth Morgan • Dennis Roberts

# San Bernardino County jail conditions subject of meeting

By Joe Nelson , The Sun

sbsun.com

A prisoner rights nonprofit and San Bernardino County are working on an agreement to ensure inmates at the West Valley Detention Center in Rancho Cucamonga and other county jails are receiving adequate medical treatment and are not being abused by deputies.

"What we're concerned about is certain conditions in the jails such as health care, and we're also concerned about excessive use of force on prisoners by jail staff," said Donald Specter, executive director of the Prison Law Office in Berkeley, which provides free legal services to state prisoners and occasionally to parolees.

Last year, attorneys with the Prison Law Office filed a civil rights lawsuit against Riverside County, which was granted class-action status last month. The lawsuit alleges inadequate medical and mental health care in the county's five jails. A similar lawsuit was filed against Fresno County but was settled out of court.

Specter said he and attorneys from his office met with San Bernardino County Sheriff John McMahon and county Chief Executive Officer Greg Devereaux in late August at the West Valley Detention Center, which the FBI has been investigating since April after allegations surfaced that inmates were being physically assaulted and repeatedly stunned with Taser guns by deputies, according to inmates and lawsuits filed in federal court alleging civil rights violations against nearly a dozen inmates at the jail.

Three rookie deputies: Brock Teyechea, Andrew Cruz and Nicholas Oakley, were fired in the wake of the federal criminal investigation. They had all been out of the academy less than a year when the allegations surfaced.

"It's consistent with what we've been hearing," said Specter of the abuse allegations. "Dozens of prisoners have alleged they have been Tazed with little or no provocation,"

The two federal lawsuits have been stayed for six months so they don't interfere with the FBI investigation and so attorneys can negotiate settlements, according to online court records.

Advertisement

County CEO Greg Devereaux said the August meeting went well and everyone was "very cordial and respectful" on both sides.

"I think they were interested in seeing if we could work together to look at jail conditions and to see whether there were corrections or adjustments that needed to be made," Devereaux said. "I think the concerns they raised are ones that we too are concerned about, especially given the level of funding that we have in this county for mental health."

He said the county has been underfunded in the area of mental health since the 1991 realignment of the Health and Human Services system.

"We don't get as much per capita as other areas of the state, and we can certainly use more mental health funding in this county," Devereaux said.

Specter said his office has interviewed more than 700 inmates from San Bernardino County, and more than 100 of them have complained of deputies using excessive force.

Oct 14, 2014 12:27:11PM MDT

According to inmate interviews and claims filed with the county, grievance forms are routinely denied when requested, or, deputies will threaten inmates with retribution if they ask for a grievance form.

Sheriff John McMahon couldn't be reached for comment Monday, but has stood by his deputies and the activities at the jail. He said he was unaware of any pattern of inmate abuse, and said the recent allegations are isolated to a few deputies. He touted the medical treatment of inmates as first rate during a tour of the jail in May.

Devereaux said County Counsel has been tasked with drafting a memorandum of understanding with the Prison Law Office and will eventually contact attorneys at the organization to discuss it.

"The next step is to see if we can negotiate an agreement that is acceptable to both of us on how to proceed," Devereaux said.


Joe Nelson

Joe Nelson covers San Bernardino County for The Sun, Daily Bulletin and Redlands Daily Facts. Reach the author at joe.nelson@langnews.com or follow Joe on Twitter: @sbcountynow.

- Full bio and more articles by Joe Nelson
- Back to top

Oct 14, 2014 12:27:11PM MDT

Case 5:15-cv-00024-JGB-JEM    Document 1    Filed 02/09/16    Page 10 of 37    Page ID #:10



UpToDate® Official reprint from UpToDate®
www.uptodate.com ©2015 UpToDate®

Wolters Kluwer
Health

## Patient information: Colon and rectal cancer (The Basics)
Written by the doctors and editors at UpToDate

**What is colorectal cancer?** — Colorectal cancer is cancer that affects the large intestine (also known as the colon) or the rectum (figure 1). The word "colorectal" is just a shortened way of saying colon and rectal.

Colorectal cancer can be serious. But there are many ways to treat it.

**Is there a test for colorectal cancer?** — Yes, there are a few tests that can find colorectal cancer. Your doctor or nurse can explain your choices.

If your doctor or nurse thinks you have colorectal cancer, he or she will probably suggest a test called a "colonoscopy." During a colonoscopy, the doctor inserts a tube and a tiny camera into your anus and up to your colon. That way he or she can look for cancer or other problems.

**What are the symptoms of colorectal cancer?** — Colorectal cancer might not cause any symptoms at first. When it does cause symptoms, it can cause:

- Stomach pain
- A change in your bowel movements (number, texture, or size)
- Blood in your bowel movements
- Feeling weak or tired

**How is colorectal cancer treated?** — Most types of colorectal cancer are treated with one or more of these:

- Surgery to remove the part of the colon or rectum that has cancer
- Medicine called chemotherapy that kills cancer cells
- Radiation therapy

**Will my body work normally after surgery?** — That depends on what type of surgery you have. If your doctor can reconnect your colon or rectum after removing the part with cancer, you should be able to have bowel movements normally. But if your doctor cannot reconnect your colon or rectum, he or she will make a hole in your belly and attach the end of the colon or a loop of intestine to that hole. The hole is called a "colostomy." Your bowel movements will come out through the opening into a bag that is glued to your skin.

Some people need to have a colostomy only for a short time. Then they can have another surgery to reconnect their colon or rectum. Other people need to have a colostomy for the rest of their life. If you need a colostomy, your doctor or nurse will put you in touch with people who can help you learn to use it.

**What happens after treatment?** — After you finish treatment, you should see your doctor or nurse every so often for a few years. That way he or she can check to see if the cancer comes back. You will probably have to have blood tests every so often, a few more colonoscopy tests, plus a special kind of X-ray called a "CT scan."

## More on this topic

Patient information: Colonoscopy (The Basics)
Patient information: Cancer screening (The Basics)
Patient information: Bloody stools (The Basics)
Patient information: What are clinical trials? (The Basics)
Patient information: Colostomy care (The Basics)
Patient information: Colectomy (The Basics)

Patient information: Colon and rectal cancer (Beyond the Basics)
Patient information: Colon polyps (Beyond the Basics)
Patient information: Colorectal cancer treatment; metastatic cancer (Beyond the Basics)

All topics are updated as new evidence becomes available and our peer review process is complete.
**This topic retrieved from UpToDate on:** Mar 03, 2015.

The content on the UpToDate website is not intended nor recommended as a substitute for medical advice, diagnosis, or treatment. Always seek the advice of your own physician or other qualified health care professional regarding any medical questions or conditions. The use of UpToDate content is governed by the UpToDate Terms of Use. ©2015 UpToDate, Inc. All rights reserved.

Topic 15412 Version 7.0



**UpToDate**®  Official reprint from UpToDate®
www.uptodate.com ©2015 UpToDate®

**Wolters Kluwer**
Health

**Patient information: Colonoscopy (The Basics)**
Written by the doctors and editors at UpToDate

**What is a colonoscopy?** — A colonoscopy is a test that looks at the inner lining of a person's large intestine. The large intestine is also called the colon (figure 1).

Often, people have colonoscopy as a screening test to check for polyps or for cancer in the colon or rectum. Polyps are growths in the colon that might turn into cancer. If you have polyps, the doctor can usually take them out during the colonoscopy. Taking polyps out lowers your chances of getting cancer. People can also have colonoscopy if they have any of the symptoms listed below. Cancer screening tests are tests that are done to try and find cancer early, before a person has symptoms. Cancer that is found early often is small and can be cured or treated easily.

Doctors can use 5 or 6 different tests to screen for colon cancer. But most doctors think that colonoscopy is the best test to screen for colon cancer.

**When should I have colon cancer screening?** — Doctors recommend that most people begin having colon cancer screening at age 50. Some people have an increased chance of getting colon cancer, because of a strong family history or certain medical conditions. These people might begin screening at a younger age.

**What are other reasons my doctor might order a colonoscopy?** — Your doctor might order a colonoscopy if you have:

- Blood in your bowel movements
- A change in your bowel habits
- A condition called anemia that can make you feel tired and weak
- Long-term belly or rectal pain that you cannot explain
- Abnormal results from a different type of colon test
- A history of colon cancer or polyps in your colon

**What should I do before a colonoscopy?** — Your doctor will give you instructions about what to do before a colonoscopy. He or she will tell you what foods you can and cannot eat. He or she will also tell you if you need to stop taking any of your usual medicines beforehand. Make sure to read the instructions as soon as you get them. You might have to stop some medicines up to a week before the test.

The colon needs to be cleaned out before a colonoscopy. Your doctor will give you a special drink that causes watery diarrhea. It is important to drink all of it to make sure your colon is clean. If your colon is clean your doctor will get a better look at the inside lining of the colon. A clean colon also makes the test easier to do and more comfortable. Let your doctor know if you have trouble getting ready for your colonoscopy.

**What happens during a colonoscopy?** — Your doctor will give you medicine to make you feel relaxed. Then he or she will put a thin tube with a camera and light on the end into your anus and up into the rectum and colon (figure 2). Your doctor will look at the inside lining of the whole colon.

During the procedure, your doctor might do a test called a biopsy. During a biopsy, a doctor takes a small piece of tissue from the colon. Then he or she looks at the tissue under a microscope to see if it has cancer. Your doctor might also remove growths that he or she sees in the colon. You will not feel it if the doctor takes a biopsy or removes a growth.

**What happens after a colonoscopy?** — Your doctor will give you instructions about what to do after a

colonoscopy. Most people can eat as usual. But most doctors recommend that people do not drive or go to work for the rest of the day. Your doctor will tell you when to start taking any medicines you had to stop before the test.

**When should I call my doctor or nurse?** — Call your doctor or nurse immediately if you have any of the following problems after your colonoscopy:

- Belly pain that is much worse than gas pain or cramps
- A bloated and hard belly
- Vomiting
- Fever
- A lot of bleeding from your anus

**More on this topic**

Patient information: Colon and rectal cancer screening (The Basics)
Patient information: Colon polyps (The Basics)
Patient information: Cancer screening (The Basics)
Patient information: Bloody stools (The Basics)
Patient information: Gas and bloating (The Basics)
Patient information: Stomach ache and stomach upset (The Basics)
Patient information: Anemia caused by low iron (The Basics)
Patient information: Colon and rectal cancer (The Basics)

Patient information: Colonoscopy (Beyond the Basics)
Patient information: Colon and rectal cancer screening (Beyond the Basics)
Patient information: Colon polyps (Beyond the Basics)

All topics are updated as new evidence becomes available and our peer review process is complete.
**This topic retrieved from UpToDate on:** Mar 03, 2015.

The content on the UpToDate website is not intended nor recommended as a substitute for medical advice, diagnosis, or treatment. Always seek the advice of your own physician or other qualified health care professional regarding any medical questions or conditions. The use of UpToDate content is governed by the UpToDate Terms of Use. ©2015 UpToDate, Inc. All rights reserved.

Topic 15413 Version 6.0



UpToDate®  Official reprint from UpToDate®
www.uptodate.com ©2015 UpToDate®

**Wolters Kluwer**
Health

The content on the UpToDate website is not intended nor recommended as a substitute for medical advice, diagnosis, or treatment. Always seek the advice of your own physician or other qualified health care professional regarding any medical questions or conditions. The use of this website is governed by the UpToDate Terms of Use ©2015 UpToDate, Inc.

## Patient information: Colon polyps (Beyond the Basics)

**Authors**
Anne Charette, RN, MSN, ANP
Robert H Fletcher, MD, MSc

**Section Editor**
J Thomas Lamont, MD

**Deputy Editor**
Shilpa Grover, MD, MPH

*Disclosures:* **Anne Charette, RN, MSN, ANP** Nothing to disclose. **Robert H Fletcher, MD, MSc** Nothing to disclose. **J Thomas Lamont, MD** Nothing to disclose. **Shilpa Grover, MD, MPH** Employee of UpToDate, Inc.
Contributor disclosures are reviewed for conflicts of interest by the editorial group. When found, these are addressed by vetting

All topics are updated as new evidence becomes available and our peer review process is complete.
**Literature review current through:** Feb 2015. | **This topic last updated:** Feb 09, 2015.

**COLON POLYPS OVERVIEW** — The finding of polyps in the colon or rectum often raises questions for patients and their family. What is the significance of finding a polyp? Does this mean that I have, or will develop, colon or rectal (colorectal) cancer? Will a polyp require surgery?

Some types of polyps (called adenomas) have the potential to become cancerous while others (hyperplastic or inflammatory polyps) have virtually no chance of becoming cancerous.

When discussing colon polyps, the following points should be considered:

- Polyps are common (they occur in 30 to 50 percent of adults)
- Not all polyps will become cancer
- It takes many years for a polyp to become cancerous
- Polyps can be completely and safely removed

The best course of action when a polyp is found depends upon the number, type, size, and location of the polyp. People who have an adenoma removed will require a follow up examination; new polyps may develop over time that need to be removed.

**COLON POLYP CAUSES** — Polyps are very common in men and women of all races who live in industrialized countries, suggesting that dietary and environmental factors play a role in their development.

**Lifestyle** — Although the exact causes are not completely understood, lifestyle risk factors include the following:

- A high fat diet
- A diet high in red meat
- A low fiber diet
- Cigarette smoking
- Obesity

On the other hand, use of aspirin and other NSAIDs and a high calcium diet may protect against the development of colon cancer. (See "Patient information: Colon and rectal cancer screening (Beyond the Basics)".)

3/3/2015 11:23 AM

**Aging** — Colorectal cancer is uncommon before age 40. Ninety percent of cases occur after age 50, with men somewhat more likely to develop polyps than women; therefore, colon cancer screening is usually recommended starting at age 50 for both sexes. It takes approximately 10 years for a small polyp to develop into cancer.

**Family history and genetics** — Polyps and colon cancer tend to run in families, suggesting that genetic factors are also important in their development.

Any history of colon polyps or colon cancer in the family should be discussed with a healthcare provider, particularly if cancer developed at an early age, in close relatives, or in multiple family members. As a general rule, screening for colon cancer begins at an earlier age in people with a family history of cancer or polyps.

Rare genetic diseases can cause high rates of colorectal cancer relatively early in adult life. Familial adenomatous polyposis (FAP) and MUTYH-associated polyposis cause multiple colon polyps. Another, hereditary nonpolyposis colon cancer (HNPCC) or Lynch syndrome, increases the risk of colon cancer, but does not cause a large number of polyps. Testing for these genes may be recommended for families with high rates of cancer, but is not generally recommended for other groups.

**TYPES OF COLON POLYPS** — The most common types of polyps are hyperplastic and adenomatous polyps. Other types of polyps can also be found in the colon, although these are far less common and are not discussed here.

**Hyperplastic polyps** — Hyperplastic polyps are usually small, located in the end-portion of the colon (the rectum and sigmoid colon), have **no** potential to become malignant, and are not worrisome (figure 1). It is not always possible to distinguish a hyperplastic polyp from an adenomatous polyp based upon appearance during colonoscopy, which means that hyperplastic polyps are often removed or biopsied to allow microscopic examination.

**Adenomatous polyps** — Two-thirds of colon polyps are adenomas. Most of these polyps do not develop into cancer, although they have the potential to become cancerous. Adenomas are classified by their size, general appearance, and their specific features as seen under the microscope.

As a general rule, the larger the adenoma, the more likely it is to eventually become a cancer. As a result, large polyps (larger than 5 millimeters, about 3/8 inch) are usually removed completely to prevent cancer and for microscopic examination to guide follow-up testing.

**Malignant polyps** — Polyps that contain pre-cancerous or cancerous cells are known as malignant polyps. The optimal treatment for malignant polyps depends upon the extent of the cancer (when examined with a microscope) and other individual factors. (See "Approach to the patient with colonic polyps".)

**COLON POLYP DIAGNOSIS** — Polyps usually do not cause symptoms but may be detected during a colon cancer screening examination (such as flexible sigmoidoscopy or colonoscopy) (picture 1) or after a positive fecal occult blood test. Polyps can also be detected on a barium enema x-ray, although small polyps are more difficult to see with x-ray.

Colonoscopy is the best way to evaluate the colon because it allows the physician to see the entire lining of the colon and remove most polyps that are found (occasionally, large polyps need to be removed during a separate procedure). During colonoscopy, a physician inserts a very thin flexible tube with a light source and small camera into the anus. The tube is advanced through the entire length of the large intestine (colon). (See "Patient information: Colonoscopy (Beyond the Basics)".)

The inside of the colon is a tube-like structure with a flat surface with curved folds. A polyp appears as a lump that protrudes into the inside of the colon (picture 1). The tissue covering a polyp may look the same as normal colon tissue, or, there may be tissue changes ranging from subtle color changes to ulceration and bleeding.

3/3/2015 11:23 AM

Some polyps are flat ("sessile") and others extend out on a stalk ("pedunculated").

Colonoscopy is also the best test for the follow-up examination of polyps. Virtual colonoscopy using CT technology is another test used to detect polyps.

**COLON POLYP REMOVAL** — Colorectal cancer is preventable if precancerous polyps (ie, adenomas) are detected and removed before they become malignant (cancerous). Over time, small polyps can change their structure and become cancerous. Polyps are usually removed when they are found on colonoscopy, which eliminates the chance for that polyp to become cancerous.

**Procedure** — The medical term for removing polyps is polypectomy. Most polypectomies can be performed through a colonoscope. Small polyps can be removed with an instrument that is inserted through the colonoscope and snips off small pieces of tissue. Larger polyps are usually removed by placing a noose, or snare, around the polyp base and burning through it with electric cautery (figure 2). The cautery also helps to stop bleeding after the polyp is removed.

Polyp removal is not painful because the lining of the colon does not have the ability to feel pain. In addition, a sedative medication is given before the colonoscopy to prevent pain caused by stretching of the colon. Rarely, a polyp will be too large to remove during colonoscopy, which means that a surgical procedure will be needed at a later time.

**Complications** — Polypectomy is safe although it has a few potential risks and complications. The most common complications are bleeding and perforation (creating a hole in the colon). Fortunately, this occurs infrequently (one in 1000 patients having colonoscopy). Bleeding can usually be controlled during colonoscopy by cauterizing (applying heat) to the bleeding site; surgery is sometimes required for perforation.

**Medication use** — Nonsteroidal anti-inflammatory drugs (NSAIDs) including aspirin, ibuprofen (sample brand names: Advil, Motrin), and naproxen (sample brand name: Aleve) can usually be continued before your colonoscopy. Acetaminophen (sample brand name: Tylenol) is safe to take. People who require anti-clotting medications such as warfarin (sample brand name: Coumadin) should discuss how and when to stop and resume this medication with their clinician.

**COLON CANCER PREVENTION**

**Follow-up colonoscopy** — Patients should discuss the results of the tissue analysis when they are available, within a few weeks after the procedure, to decide if and when a follow-up examination is needed. People with adenomatous polyps have an increased risk of developing more polyps, which are likely to be adenomatous. There is a 25 to 30 percent chance that adenomas will be present on a repeat colonoscopy done three years after the initial polypectomy. Some of these polyps may have been present during the original examination, but were too small to detect. Other new polyps may also have developed.

After polyps are removed, repeat colonoscopy is recommended, usually three to five years after the initial colonoscopy. However, this time interval depends upon several factors:

- Microscopic characteristics of the polyp.
- Number and size of the polyps.
- Ability to see the colon during the colonoscopy. A bowel preparation is needed before colonoscopy to remove all traces of feces (stool). If the bowel prep was not completed, feces may remain in the colon, making it more difficult to see small to moderate size polyps. In this situation, follow up colonoscopy may be recommended sooner than three to five years later.
- Whether it was possible to examine the entire colon.

Persons who undergo screening (and re-screening) for colon cancer are much less likely to die from colon cancer. Thus, following screening guidelines is important in the prevention of colon cancer.

**Lifestyle measures** — Guidelines issued by one of the major medical societies in the United States (the American College of Gastroenterology) suggest the following:

- Eat a diet that is low in fat and high in fruits, vegetables, and fiber
- Maintain a normal body weight
- Avoid smoking and excessive alcohol use

(See "Patient information: Diet and health (Beyond the Basics)" and "Patient information: Quitting smoking (Beyond the Basics)".)

**IMPLICATIONS FOR THE FAMILY** — First-degree relatives (a parent, brother, sister, or child) of a person who has been diagnosed with an adenomatous polyp (or colorectal cancer) before the age of 60 years have an increased risk of developing adenomatous polyps and colorectal cancer compared to the general population. Thus, family should be made aware if the person is diagnosed with an adenoma or colon cancer.

While screening for polyps and cancer is recommended for everyone (typically beginning at age 50), those at increased risk should begin screening earlier. The best test for screening in people with an increased risk of cancer is not known, although a sensitive test (such as colonoscopy) is usually recommended.

Relatives can be told the following, based on typical guidelines for screening people with a family history of colorectal cancer;

*MotheR Died of Colon Cancer Age 62, 2003.*

- People who have one first-degree relative (parent, brother, sister, or child) with colorectal cancer or an advanced type of adenomatous polyps at a young age (before the age of 60 years), or two first-degree relatives diagnosed at any age, should begin screening for colon cancer earlier, typically at age 40, or 10 years younger than the earliest diagnosis in their family, whichever comes first. Screening usually includes colonoscopy, which should be repeated every five years. (See "Patient information: Colon and rectal cancer screening (Beyond the Basics)", section on 'Average risk of colorectal cancer'.)

- People with a second-degree relative (grandparent, aunt, or uncle) or third-degree relative (great-grandparent or cousin) with colorectal cancer should be screened for colon cancer similar to a person with an average risk. (See "Patient information: Colon and rectal cancer screening (Beyond the Basics)", section on 'Average risk of colorectal cancer'.)

- Some conditions, such as hereditary nonpolyposis colorectal cancer (Lynch syndrome), familial adenomatous polyposis, MUTYH- associated polyposis, and inflammatory bowel disease (eg, ulcerative colitis, Crohn's disease) significantly increase the risk of colon polyps or cancer in family members. Colon cancer screening in this group is discussed separately. (See "Patient information: Colon and rectal cancer screening (Beyond the Basics)", section on 'Increased risk of colorectal cancer'.)

**WHERE TO GET MORE INFORMATION** — Your healthcare provider is the best source of information for questions and concerns related to your medical problem.

This article will be updated as needed on our web site (www.uptodate.com/patients). Related topics for patients as well as selected articles written for healthcare professionals, are also available. Some of the most relevant are listed below.

**Patient level information** — UpToDate offers two types of patient education materials.

**The Basics** — The Basics patient education pieces answer the four or five key questions a patient might have about a given condition. These articles are best for patients who want a general overview and who prefer short, easy-to-read materials.

Patient information: Colon polyps (The Basics)
Patient information: Colon and rectal cancer (The Basics)

Patient information: Colonoscopy (The Basics)
Patient information: Colon and rectal cancer screening (The Basics)
Patient information: Acromegaly (The Basics)
Patient information: Familial adenomatous polyposis (The Basics)

**Beyond the Basics** — Beyond the Basics patient education pieces are longer, more sophisticated, and more detailed. These articles are best for patients who want in-depth information and are comfortable with some medical jargon.

Patient information: Colon and rectal cancer screening (Beyond the Basics)
Patient information: Colonoscopy (Beyond the Basics)
Patient information: Diet and health (Beyond the Basics)
Patient information: Quitting smoking (Beyond the Basics)

**Professional level information** — Professional level articles are designed to keep doctors and other health professionals up-to-date on the latest medical findings. These articles are thorough, long, and complex, and they contain multiple references to the research on which they are based. Professional level articles are best for people who are comfortable with a lot of medical terminology and who want to read the same materials their doctors are reading.

Approach to the patient with colonic polyps
Bleeding after colonic polypectomy
Clinical manifestations and diagnosis of familial adenomatous polyposis
Lynch syndrome (hereditary nonpolyposis colorectal cancer): Clinical manifestations and diagnosis
Colorectal cancer: Epidemiology, risk factors, and protective factors
Endoscopic removal of large colon polyps
Gardner syndrome
Peutz-Jeghers syndrome: Epidemiology, clinical manifestations, and diagnosis
Screening for colorectal cancer: Strategies in patients at average risk
Screening for colorectal cancer in patients with a family history of colorectal cancer

The following organizations also provide reliable health information.

- National Library of Medicine

  (www.nlm.nih.gov/medlineplus/healthtopics.html)

- The American Gastroenterological Association

  (www.gastro.org)

- The American College of Gastroenterology

  (www.acg.gi.org)

- The American Society of Colon and Rectal Surgeon

  (www.fascrs.org)

[1-3]

Use of UpToDate is subject to the Subscription and License Agreement.

**REFERENCES**

1. Winawer S, Fletcher R, Rex D, et al. Colorectal cancer screening and surveillance: clinical guidelines and rationale-Update based on new evidence. Gastroenterology 2003; 124:544.

2. Winawer SJ, Zauber AG, Ho MN, et al. Prevention of colorectal cancer by colonoscopic polypectomy. The National Polyp Study Workgroup. N Engl J Med 1993; 329:1977.

3. Bond JH. Polyp guideline: diagnosis, treatment, and surveillance for patients with colorectal polyps. Practice Parameters Committee of the American College of Gastroenterology. Am J Gastroenterol 2000; 95:3053.

Topic 2019 Version 13.0

Case 3:16-cv-00247-JCB-FPM Document 1 Filed 02/09/16 Page 20 of 37 Page ID #:20



UpToDate®    Official reprint from UpToDate®
www.uptodate.com ©2015 UpToDate®

Wolters Kluwer
Health

## Graves' hyperthyroidism in nonpregnant adults: Overview of treatment

| **Author** | **Section Editor** | **Deputy Editor** |
|---|---|---|
| Douglas S Ross, MD | David S Cooper, MD | Jean E Mulder, MD |

**Disclosures:** Douglas S Ross, MD Grant/Research/Clinical Trial Support: Genzyme [Thyroid cancer (rhTSH)]. Consultant/Advisory Board: Bayer [Thyroid cancer (Sorafenib)]; Eisai [Thyroid cancer (Lenvatinib)]. **David S Cooper, MD** Nothing to disclose. **Jean E Mulder, MD** Employee of UpToDate, Inc.

All topics are updated as new evidence becomes available and our peer review process is complete.
**Literature review current through: Feb 2015. | This topic last updated: Jan 12, 2015.**

**INTRODUCTION** — Graves' disease is an autoimmune disease that may consist of hyperthyroidism, goiter, eye disease (orbitopathy), and occasionally a dermopathy referred to as pretibial or localized myxedema. Hyperthyroidism is the most common feature of Graves' disease, affecting nearly all patients, and is caused by thyroid-stimulating hormone (TSH, thyrotropin)-receptor antibodies (TRAb) that activate the receptor, thereby stimulating thyroid hormone synthesis and secretion as well as thyroid growth (causing a diffuse goiter). The presence of TRAb in serum and orbitopathy on clinical examination distinguish the disorder from other causes of hyperthyroidism.

This topic will provide an overview of treatment options for Graves' hyperthyroidism in nonpregnant adults. The pathogenesis of Graves' disease, the clinical manifestations and diagnosis of hyperthyroidism, other causes of an overactive thyroid gland, as well as treatment of Graves' disease in pregnant women and children are reviewed in more detail in separate topic reviews. The treatment of hyperthyroidism due to other etiologies is reviewed in the individual topics.

- (See "Pathogenesis of Graves' disease".)

- (See "Overview of the clinical manifestations of hyperthyroidism in adults".)

- (See "Diagnosis of hyperthyroidism".)

- (See "Disorders that cause hyperthyroidism".)

- (See "Hyperthyroidism during pregnancy: Treatment".)

- (See "Treatment and prognosis of Graves' disease in children and adolescents".)

**THERAPEUTIC APPROACH** — The therapeutic approach to Graves' hyperthyroidism consists of both rapid amelioration of symptoms with a beta blocker and measures aimed at decreasing thyroid hormone synthesis: the administration of a thionamide, radioiodine ablation, or surgery [1].

The approach outlined below is consistent with Hyperthyroidism Management Guidelines from the American Thyroid Association (ATA) and the American Association of Clinical Endocrinologists (AACE) [2].

**Symptom control** — A beta blocker should be started (assuming there are no contraindications to its use) in most patients as soon as the diagnosis of hyperthyroidism is made, even before confirming that the cause of hyperthyroidism is Graves' disease. We usually give atenolol (25 to 50 mg/day), which has the advantages of single daily dosing and beta-1 selectivity; however, all beta-adrenergic blocking drugs effectively diminish hyperthyroid symptoms. Beta blockers ameliorate the symptoms of hyperthyroidism that are caused by increased beta-adrenergic tone [3]. These include palpitations, tachycardia, tremulousness, anxiety, and heat intolerance. Fatigability and shortness of breath were also improved in patients who were treated with a beta

blocker and a thionamide versus a thionamide alone [4]. (See "Beta blockers in the treatment of hyperthyroidism".)

**Decrease thyroid hormone synthesis**

**Choice of therapy** — Graves' hyperthyroidism can be treated with an antithyroid drug (a thionamide), radioactive iodine, or thyroidectomy. Because all three treatment modalities are effective, the choice of therapy should involve active discussion between clinician and patient (table 1) [5]. Individual patient factors may influence choice of therapy. As an example, in a patient with mild hyperthyroidism and minimal thyroid enlargement, thionamides or radioiodine are good options. In a patient with severe hyperthyroidism and a large goiter who requires rapid control of hyperthyroidism, surgery might be the best option but is usually delayed until hyperthyroidism is controlled with a thionamide.

For patients with significant symptoms of hyperthyroidism, we suggest starting a thionamide (in addition to beta blockers) to achieve euthyroidism quickly. Once patients are euthyroid, we suggest radioiodine as our first choice for definitive therapy of hyperthyroidism, in the absence of moderate to severe ophthalmopathy, due to its lower cost and lower complication rate than surgery. For patients with only mild symptoms, there is no need to pretreat with a thionamide, and radioiodine can be given soon after the diagnosis is made. Primary antithyroid drug therapy is an alternative option for patients with mild disease and small goiters, who are more likely to achieve remission after one year of treatment. For patients with hyperthyroidism due to a very large or obstructive goiter, we suggest surgery. Surgery is also indicated for pregnant women who are allergic to antithyroid drugs and in patients who have allergies or poor compliance on antithyroid drugs but refuse radioiodine. Surgery is also an option for patients with moderate to severe active ophthalmopathy who desire definitive therapy for their hyperthyroidism.

In the only randomized trial comparing these three therapies, each was equally effective in normalizing serum thyroid hormone concentrations within six weeks; after treatment, 95 percent or more of the patients were satisfied with their therapy [6]. In addition, most patients reported that they would recommend the therapy to a friend without reservation (medical: 68 percent; surgical: 74 percent; radioiodine: 84 percent). The risk of relapse was 37, 21, and 6 percent in the thionamide, radioiodine, and surgery groups, respectively.

The individual therapies are discussed briefly below and in more detail in the individual topic reviews.

**Thionamides** — For patients with significant symptoms of hyperthyroidism, we suggest starting a thionamide (in addition to beta blockers) to achieve euthyroidism relatively quickly, prior to more definitive therapy with radioiodine or surgery. Primary antithyroid drug therapy is an option for patients with mild disease and small goiters, who are more likely to achieve remission after one year of treatment.

The thionamide methimazole is the primary drug used to treat Graves' hyperthyroidism [2]. Methimazole is now almost exclusively used because of its longer duration of action, allowing for once daily dosing, more rapid efficacy (figure 1), and lower incidence of side effects. Propylthiouracil (PTU) is preferred during the first trimester of pregnancy because of the potential teratogenic effects of methimazole and in patients who have minor drug reactions to methimazole who refuse radioiodine or surgery. (See "Pharmacology and toxicity of thionamides".)

The goal of thionamide therapy in Graves' hyperthyroidism is to attain a euthyroid state within three to eight weeks. This can be followed by ablative therapy with radioiodine or surgery or by continuation of the drug for a prolonged period (usually one to two years) with the hope of attaining a permanent remission. (See "Thionamides in the treatment of Graves' disease".)

Prior to initiating thionamides, we obtain baseline blood tests, including a complete blood count (white count with differential) and a liver profile (bilirubin and transaminases) [2]. We do not use thionamides in patients with a baseline absolute neutrophil count <500 mm$^3$ or elevated liver transaminases (more than fivefold the upper

limit of normal) except in selected patients after careful assessment of alternatives and risks.

The starting dose of methimazole varies according to the severity of the hyperthyroidism. Patients with small goiters and mild hyperthyroidism (free thyroxine [T4] levels 1 to 1.5 times the upper limit of normal) can be started on 10 mg once daily; this regimen is as effective as larger doses in most cases (figure 2), and side-effects from methimazole are dose related. Patients with larger goiters and more severe hyperthyroidism (free T4 levels approximately >2 times the upper limit of normal) should be started on 20 to 30 mg daily. We administer initial therapy in divided doses in these patients for a week or two to minimize gastrointestinal side effects, and then change to single daily dosing. If long-term medical therapy is chosen, the dose of methimazole is then tapered to a maintenance dose with the goal of maintaining a euthyroid state. (See "Thionamides in the treatment of Graves' disease", section on 'Dosing'.)

In countries where methimazole is unavailable, carbimazole can be used. It is metabolized to methimazole, and the dose required to yield a similar dose of methimazole is approximately 40 percent higher. For example, a 10 or 20 mg dose of carbimazole yields roughly 6 and 15 mg of methimazole, respectively.

There are several other issues related to thionamide therapy, including management of complications, the prevalence of permanent remission after cessation of therapy (about 50 percent) [6], the time course of relapse, and its negative effect on subsequent radioactive iodine therapy. (See "Pharmacology and toxicity of thionamides", section on 'Toxicity' and "Thionamides in the treatment of Graves' disease".)

**Radioiodine ablation** — For nonpregnant patients with Graves' disease, we suggest radioiodine as our first choice for definitive therapy of hyperthyroidism, in the absence of moderate or severe orbitopathy, due to its lower cost and lower complication rate than surgery. For patients with significant symptoms of hyperthyroidism, who are older, or who have underlying heart disease, we treat with a thionamide (in addition to beta blockers) to restore euthyroidism prior to radioiodine treatment. For patients with mild, well-tolerated hyperthyroidism, there is no need to pretreat with a thionamide, and radioiodine can be given soon after the diagnosis is made. (See "Radioiodine in the treatment of hyperthyroidism", section on 'Pretreatment with thionamides'.)

Radioiodine is widely used for the treatment of Graves' hyperthyroidism. It has been the therapy of choice in the United States, being selected by 60 percent of thyroid specialists who responded to a survey in 2011 but only 13 percent of European thyroid specialists [7]. Although a thionamide provides control of hyperthyroidism as long as the drug is taken, the persistent remission rate when the drug is discontinued one to two years later averages only about 50 percent [6]. However, there are patients in whom it may be reasonable to delay radioiodine (or surgery). Included in this group are patients with mild hyperthyroidism and patients with small goiters or with goiters that shrink during thionamide therapy.

If radioiodine is chosen, the patient must be comfortable with the decision to ablate the thyroid and be aware that prolonged thionamide therapy lasting even decades is an acceptable alternative as long as the drug is tolerated and the hyperthyroidism is controlled. Clinicians and patients must also be aware that there is increasing evidence that radioiodine therapy can cause the development or worsening of Graves' ophthalmopathy more often than antithyroid drug therapy or surgery. The changes are often mild and transient, at least in patients who have mild or no ophthalmopathy before therapy. However, many clinicians avoid radioiodine in patients with moderate to severe ophthalmopathy, but not all experts agree that moderate to severe or even advanced ophthalmopathy is an absolute contraindication to radioiodine, if glucocorticoids are given concurrently. (See "Radioiodine in the treatment of hyperthyroidism", section on 'Severe ophthalmopathy' and "Radioiodine in the treatment of hyperthyroidism", section on 'Radioiodine and ophthalmopathy'.)

Radioiodine is administered as a capsule or, less commonly, an oral solution of sodium I-131, which is rapidly absorbed from the gastrointestinal (GI) tract and concentrated in thyroid tissue. Radioiodine induces extensive tissue damage, resulting in ablation of the thyroid within 6 to 18 weeks [8]. Approximately 10 to 20 percent of patients fail the first radioiodine treatment and require a second or subsequent dose. These patients usually

Case 3:16-cv-00247-JGB-FFM   Document 1   Filed 02/09/16   Page 23 of 37   Page ID #:23

have more severe hyperthyroidism or larger goiters. A discussion on dosing and side effects, including hypothyroidism, can be found elsewhere. (See "Radioiodine in the treatment of hyperthyroidism", section on 'Monitoring' and "Radioiodine in the treatment of hyperthyroidism", section on 'Adverse effects'.)

**Surgery** — For a patient with severe hyperthyroidism and a large goiter, we suggest surgery. It is also indicated for patients who are allergic to thionamides and are unable to or do not want to receive radioiodine. (See "Surgical management of hyperthyroidism".)

Surgery is an unpopular therapy for Graves' hyperthyroidism, being selected by only 1 percent of thyroid specialists [7]. It is primarily indicated in patients who have an obstructive goiter or a very large goiter, in patients with moderate to severe active ophthalmopathy who desire definitive therapy for their hyperthyroidism, in pregnant women who are allergic to antithyroid drugs, and in patients who have allergies or poor compliance on antithyroid drugs but refuse radioiodine. Surgery would also be indicated if there was a coexisting suspicious or malignant thyroid nodule or primary hyperparathyroidism. However, most thyroid nodules associated with Graves' disease are benign, in which case surgery would not be recommended [9]. Patients who fear radioactivity or have had an adverse effect with thionamide drugs may also prefer surgery.

Preoperative preparation for patients with hyperthyroidism is reviewed in detail separately. (See "Surgical management of hyperthyroidism", section on 'Preoperative preparation'.)

**Pregnancy** — We advise women desiring to become pregnant in the near future to consider radioiodine or surgery six months in advance of a planned pregnancy, to avoid the need for a thionamide during the pregnancy. However, if radioiodine or surgery is not desired, PTU therapy would be the preferred drug during the first trimester of pregnancy. The treatment of hyperthyroidism during pregnancy is reviewed separately. (See "Hyperthyroidism during pregnancy: Treatment".)

**Adjunctive therapies** — Patients who have severe hyperthyroidism or are allergic to thionamides may benefit from alternative medical therapies. We rarely use these adjunctive therapies with the exception of iodine, which we use for preoperative preparation for thyroidectomy in Graves' disease, for the treatment of severe hyperthyroidism or thyroid storm, or less commonly, after administration of radioiodine or with antithyroid drugs. (See "Iodine in the treatment of hyperthyroidism", section on 'Indications'.)

**Iodinated contrast agents and iodine** — The oral radiocontrast agents sodium ipodate and iopanoic acid are potent inhibitors of the peripheral conversion of T4 to triiodothyronine (T3). They are not used as primary therapy because of possible induction of resistant hyperthyroidism. However, when given in combination with methimazole (at doses of 500 to 1000 mg/day), they can rapidly ameliorate severe hyperthyroidism and can also be used to prepare a hyperthyroid patient for early surgery. However, these drugs are not currently available in the United States. (See "Iodinated radiocontrast agents in the treatment of hyperthyroidism".)

Iodine elixirs, up to 10 drops of saturated solution of potassium iodide (SSKI, 50 mg iodide per drop [0.05 mL]) daily, can be used to ameliorate very mild hyperthyroidism due to Graves' disease. For mild hyperthyroidism that persists after a dose of radioiodine, smaller doses (1 to 2 drops per day) are usually sufficient. (See "Iodine in the treatment of hyperthyroidism".)

**Other medications** — A number of other medications have been used in the management of hyperthyroidism, including the following:

- Glucocorticoids inhibit peripheral T4 to T3 conversion and, in patients with Graves' hyperthyroidism, reduce thyroid secretion. They have been used in patients with severe hyperthyroidism and thyroid storm, although their efficacy is not well demonstrated. (See "Thyroid storm", section on 'Glucocorticoids'.)

- Lithium blocks thyroid hormone release, but its use has been limited by its toxicity. (See "Lithium and the thyroid".)

- Cholestyramine, given in a dose of 4 g four times daily with methimazole, lowers serum T4 and T3 concentrations more rapidly than methimazole alone [10] and may be useful adjunctive therapy in selected patients who require rapid amelioration of hyperthyroid symptoms.

- Carnitine is a naturally occurring peripheral antagonist of thyroid hormone action that has been shown to ameliorate hyperthyroid symptoms and may prove to be useful clinically [11].

- Rituximab, a monoclonal antibody that causes peripheral B cell depletion, may induce a sustained remission in patients with Graves' disease and low TRAb levels, but its cost and side effects limit its utility [12].

- In China and many other countries, Chinese herbal medicines are used alone or in combination with antithyroid drugs to treat hyperthyroidism. These herbs are claimed to weaken the biological effects of T4 and inhibit the transformation of T4 to T3. Some are said to be able to modulate the function of sympathetic nerves or the immune system. In a systematic review and meta-analysis of 13 trials of 1770 participants, the addition of Chinese herbal medicines to antithyroid drugs was beneficial in some patients for reducing relapse rates, improving symptoms, and reducing adverse effects such as agranulocytosis [13]. However, the methodological quality of the trials was poor, and the authors concluded that there are currently no well-designed trials to provide strong evidence for Chinese traditional herbal medicine in the treatment of hyperthyroidism.

**Skeletal health** — Overt hyperthyroidism is associated with accelerated bone remodeling, reduced bone density, osteoporosis, and an increase in fracture rate. The bone density changes may or may not be reversible with therapy. These changes in bone metabolism are associated with negative calcium balance, hypercalciuria, and rarely, hypercalcemia. Since hyperthyroidism results in a negative calcium balance, reduced bone density, and increased fracture risk, patients (with the exception of those with hypercalcemia) should be advised to ingest 1200 to 1500 mg elemental calcium daily through diet or supplements. (See "Bone disease with hyperthyroidism and thyroid hormone therapy" and "Calcium and vitamin D supplementation in osteoporosis".)

## MONITORING AFTER TREATMENT

**Thyroid function tests** — Whatever treatment is used, initial monitoring should consist of periodic clinical assessment and measurements of serum free thyroxine (T4) and often triiodothyronine (T3) levels. Serum thyroid-stimulating hormone (TSH) concentrations should be interpreted with caution, since they may remain low for several weeks after the patient becomes euthyroid and may even remain low transiently in patients who have become hypothyroid.

Patients should have their thyroid function assessed at four to six-week intervals until stabilized on maintenance thionamide therapy. Patients with persistently low serum TSH concentrations after more than six months of therapy with a thionamide are unlikely to have a remission when the drug is stopped. Therefore, before trying to discontinue the thionamide, a plan should be established for subsequent treatment of recurrent hyperthyroidism, either definitive therapy (radioiodine or surgery) or another one to two-year course of a thionamide. Patients with persistently high levels of thyrotropin receptor antibodies (TRAb, thyroid-stimulating immunoglobulins [TSI]) after one or more years of treatment are also unlikely to remain euthyroid if thionamides are discontinued [14]. (See "Thionamides in the treatment of Graves' disease", section on 'Monitoring and duration of therapy'.)

For patients treated with radioiodine, we measure free T4 and T3 six to eight weeks after treatment, and then a four to eight-week intervals thereafter. (See "Radioiodine in the treatment of hyperthyroidism", section on 'Monitoring'.)

For patients with Graves' disease who undergo near-total or total thyroidectomy, thyroid hormone should be initiated prior to discharge in a euthyroid patient, and serum TSH should be measured six to eight weeks later to

adjust the dose to maintain the TSH in the normal reference rage. If the patient is still hyperthyroid at the time of surgery, thyroid hormone replacement should be delayed until levels fall into the normal range; the interval can be estimated based on the week-long half-life of T4. (See "Surgical management of hyperthyroidism", section on 'Hypothyroidism'.)

**Weight gain** — Weight loss is a common feature of hyperthyroidism, and many patients gain considerable weight after treatment of their hyperthyroidism [15-19]. In the largest study of 162 hyperthyroid patients followed for up to 24 months after treatment (radioiodine, a thionamide, or surgery), mean (± SE) weight gain was 5.4 ± 0.5 kg and increase in body mass index (BMI) was 8 ± 1 percent [15].

In the same report, preexisting obesity, a diagnosis of Graves' disease, and prior weight loss independently predicted weight gain. Patients who developed hypothyroidism, even transiently, gained the most weight in spite of T4 replacement (8.06 ± 1.42 kg). This phenomenon does not appear to be simple regaining of previously lost weight, since the percentage of overweight (BMI >25 kg/m$^2$) and obese (BMI >30 kg/m$^2$) patients increased from 38 and 10 percent just before the treatment to 56 and 19 percent at the end of the follow-up period.

Proposed mechanisms for the excessive weight gain include:

- Subnormal energy expenditure after treatment [16], without concomitant reduction in appetite or food intake [17].
- Inadequate thyroid hormone replacement [19].

Patients should be advised about the likelihood of weight gain, which may in part be prevented by dietary advice [20]. (See "Obesity in adults: Overview of management", section on 'Approach to therapy'.)

**INFORMATION FOR PATIENTS** — UpToDate offers two types of patient education materials, "The Basics" and "Beyond the Basics." The Basics patient education pieces are written in plain language, at the 5th to 6th grade reading level, and they answer the four or five key questions a patient might have about a given condition. These articles are best for patients who want a general overview and who prefer short, easy-to-read materials. Beyond the Basics patient education pieces are longer, more sophisticated, and more detailed. These articles are written at the 10th to 12th grade reading level and are best for patients who want in-depth information and are comfortable with some medical jargon.

Here are the patient education articles that are relevant to this topic. We encourage you to print or e-mail these topics to your patients. (You can also locate patient education articles on a variety of subjects by searching on "patient info" and the keyword(s) of interest.)

- Basics topics (see "Patient information: Hyperthyroidism (overactive thyroid) (The Basics)")
- Beyond the Basics topics (see "Patient information: Hyperthyroidism (overactive thyroid) (Beyond the Basics)" and "Patient information: Antithyroid drugs (Beyond the Basics)")

**SUMMARY AND RECOMMENDATIONS**

- Hyperthyroidism is the most common feature of Graves' disease, affecting nearly all patients, and is caused by thyroid-stimulating hormone (TSH, thyrotropin)-receptor antibodies (TRAb) that activate the receptor, thereby stimulating thyroid hormone synthesis and secretion as well as thyroid growth (causing a diffuse goiter). (See 'Introduction' above and "Pathogenesis of Graves' disease".)
- The therapeutic approach to Graves' hyperthyroidism consists of both rapid amelioration of symptoms with a beta blocker and measures aimed at decreasing thyroid hormone synthesis: the administration of a thionamide, radioiodine ablation, or surgery (table 1). The choice of therapy should involve active discussion between clinician and patient; it may also be determined by the severity of the patient's hyperthyroidism. (See 'Therapeutic approach' above and 'Choice of therapy' above.)

- Assuming there are no contraindications to its use, we recommend using a beta blocker for patients with moderate to severe hyperadrenergic symptoms until euthyroidism is achieved by thionamides, radioiodine, or surgery (**Grade 1B**). (See 'Symptom control' above and "Beta blockers in the treatment of hyperthyroidism".)

  We typically start with atenolol 25 to 50 mg daily and increase the dose as needed (up to 200 mg daily) to reduce pulse to under 90 beats per minute if blood pressure allows.

- For patients with significant symptoms of hyperthyroidism, we suggest starting a thionamide (methimazole) to achieve euthyroidism quickly (**Grade 2B**). (See 'Choice of therapy' above and 'Thionamides' above and "Thionamides in the treatment of Graves' disease".)

- Once patients are euthyroid on a thionamide, we suggest radioiodine therapy in the absence of moderate to severe ophthalmopathy as our first choice for definitive therapy of the hyperthyroidism, given its lower cost and lower complication rate than surgery (**Grade 2B**). Primary antithyroid drug therapy is an alternative option for patients with mild disease and small goiters, who are more likely to achieve a remission after a year of treatment. (See 'Choice of therapy' above.)

- For patients who are less symptomatic, there is no need to pretreat with a thionamide, and radioiodine can be given soon after the diagnosis is made. (See 'Choice of therapy' above and "Radioiodine in the treatment of hyperthyroidism", section on 'Pretreatment with thionamides'.)

- For patients with hyperthyroidism due to a very large or obstructive goiter, we suggest surgery (**Grade 2C**). Surgery may also be preferred in patients with active ophthalmopathy. (See 'Choice of therapy' above and "Surgical management of hyperthyroidism".)

- We advise women desiring to become pregnant in the near future to consider radioiodine or surgery six months in advance of a planned pregnancy to avoid the need for a thionamide during the pregnancy. However, if radioiodine or surgery is not desired, propylthiouracil (PTU) therapy would be the preferred drug during the first trimester of pregnancy. (See "Hyperthyroidism during pregnancy: Treatment".)

- Several concerns of the patient also may influence the choice of therapy. As an example, the recommendation to avoid close contact with young children for several days after radioiodine administration may make this treatment temporarily unattractive if alternative childcare is unavailable. Patient fears regarding radiation exposure or agranulocytosis from thionamides should also be considered. (See "Radioiodine in the treatment of hyperthyroidism" and "Pharmacology and toxicity of thionamides".)

- Whatever treatment is used, initial monitoring following treatment should consist of periodic clinical assessment and measurements of serum free thyroxine (T4) and sometimes triiodothyronine (T3) levels. Measurement of serum TSH can be misleading in the early follow-up period because it can remain low for weeks or even months, even when the patient is biochemically euthyroid or even hypothyroid, with serum free T4 values well within or even below the normal range. (See 'Thyroid function tests' above.)

Use of UpToDate is subject to the Subscription and License Agreement.

## REFERENCES

1. Singer PA, Cooper DS, Levy EG, et al. Treatment guidelines for patients with hyperthyroidism and hypothyroidism. Standards of Care Committee, American Thyroid Association. JAMA 1995; 273:808.

2. Bahn Chair RS, Burch HB, Cooper DS, et al. Hyperthyroidism and other causes of thyrotoxicosis: management guidelines of the American Thyroid Association and American Association of Clinical

Endocrinologists. Thyroid 2011; 21:593.

3. Geffner DL, Hershman JM. Beta-adrenergic blockade for the treatment of hyperthyroidism. Am J Med 1992; 93:61.

4. Tagami T, Yambe Y, Tanaka T, et al. Short-term effects of β-adrenergic antagonists and methimazole in new-onset thyrotoxicosis caused by Graves' disease. Intern Med 2012; 51:2285.

5. Ross DS. Radioiodine therapy for hyperthyroidism. N Engl J Med 2011; 364:542.

6. Törring O, Tallstedt L, Wallin G, et al. Graves' hyperthyroidism: treatment with antithyroid drugs, surgery, or radioiodine--a prospective, randomized study. Thyroid Study Group. J Clin Endocrinol Metab 1996; 81:2986.

7. Burch HB, Burman KD, Cooper DS. A 2011 survey of clinical practice patterns in the management of Graves' disease. J Clin Endocrinol Metab 2012; 97:4549.

8. Franklyn JA. The management of hyperthyroidism. N Engl J Med 1994; 330:1731.

9. Cantalamessa L, Baldini M, Orsatti A, et al. Thyroid nodules in Graves disease and the risk of thyroid carcinoma. Arch Intern Med 1999; 159:1705.

10. Mercado M, Mendoza-Zubieta V, Bautista-Osorio R, Espinoza-de los Monteros AL. Treatment of hyperthyroidism with a combination of methimazole and cholestyramine. J Clin Endocrinol Metab 1996; 81:3191.

11. Benvenga S, Ruggeri RM, Russo A, et al. Usefulness of L-carnitine, a naturally occurring peripheral antagonist of thyroid hormone action, in iatrogenic hyperthyroidism: a randomized, double-blind, placebo-controlled clinical trial. J Clin Endocrinol Metab 2001; 86:3579.

12. El Fassi D, Nielsen CH, Bonnema SJ, et al. B lymphocyte depletion with the monoclonal antibody rituximab in Graves' disease: a controlled pilot study. J Clin Endocrinol Metab 2007; 92:1769.

13. Zen XX, Yuan Y, Liu Y, et al. Chinese herbal medicines for hyperthyroidism. Cochrane Database Syst Rev 2007; :CD005450.

14. Barbesino G, Tomer Y. Clinical review: Clinical utility of TSH receptor antibodies. J Clin Endocrinol Metab 2013; 98:2247.

15. Dale J, Daykin J, Holder R, et al. Weight gain following treatment of hyperthyroidism. Clin Endocrinol (Oxf) 2001; 55:233.

16. Jacobsen R, Lundsgaard C, Lorenzen J, et al. Subnormal energy expenditure: a putative causal factor in the weight gain induced by treatment of hyperthyroidism. Diabetes Obes Metab 2006; 8:220.

17. Watts MR, Moore A, Alexander WD. Weight gain and treatment for thyrotoxicosis. QJM 2002; 95:57.

18. Obermayer-Pietsch BM, Frühauf GE, Lipp RW, et al. Dissociation of leptin and body weight in hyperthyroid patients after radioiodine treatment. Int J Obes Relat Metab Disord 2001; 25:115.

19. Tigas S, Idiculla J, Beckett G, Toft A. Is excessive weight gain after ablative treatment of hyperthyroidism due to inadequate thyroid hormone therapy? Thyroid 2000; 10:1107.

20. Alton S, O'Malley BP. Dietary intake in thyrotoxicosis before and after adequate carbimazole therapy; the impact of dietary advice. Clin Endocrinol (Oxf) 1985; 23:517.

Topic 7872 Version 14.0

a. Parties to this previous lawsuit:

Plaintiff _ROBERTO ENRIQUE FONTES_

Defendants _SAN BERNARDINO County SHERIFFS DEPT, WEST Valley Detention Center AND Medical STAFF_

b. Court _____

c. Docket or case number _____

d. Name of judge to whom case was assigned _____

e. Disposition (For example:  Was the case dismissed?  If so, what was the basis for dismissal?  Was it appealed?  Is it still pending?) _____

f. Issues raised: _NoT Recieving Immediate Medical ATTENTION, Violation OF Civil Rights._

g. Approximate date of filing lawsuit: _11/1/2015   November 1ST, 2015_

h. Approximate date of disposition _____

## B.  EXHAUSTION OF ADMINISTRATIVE REMEDIES

1. Is there a grievance procedure available at the institution where the events relating to your current complaint occurred? ☑ Yes   ☐ No

2. Have you filed a grievance concerning the facts relating to your current complaint? ☑ Yes   ☐ No

   If your answer is no, explain why not _I Actually Also spoke with Several doctors OR ASSISTANTS TO TRY AND let them KNOW MY Situation regarding my Colon. Colon Cancer Runs IN My Family As Well As Other Cancers._

3. Is the grievance procedure completed? ☐ Yes   ☑ No

   If your answer is no, explain why not _I Never Recieved ANY Responses BACK ON THE Grievances on the Blockage of the Colon because it WAS So BAD when I WAS Treated due to the (Continued on Seperate Page 2OF2_

4. Please attach copies of papers related to the grievance procedure. _See 2OF2._

## C.  JURISDICTION

This complaint alleges that the civil rights of plaintiff _Roberto Enrique Fontes  Cell#11d8 Inmate #1308340722_
(print plaintiff's name)

who presently resides at _W.V.D.C. 9500 EtiwandA Ave  Rancho Cucamonga, Ca 91739_
(mailing address or place of confinement)

were violated by the actions of the defendant(s) named below, which actions were directed against plaintiff at

_SAN Bernardino County SHERIFFS Department, West Valley Detention Center, AND Medical STAFF_
(institution/city where violation occurred)

CV-66 (7/97)

**CIVIL RIGHTS COMPLAINT**

on (date or dates) _August 2013 To November 2015_ , _____ .
(Claim I)                              (Claim II)                              (Claim III)

**NOTE:** You need not name more than one defendant or allege more than one claim. If you are naming more than five (5) defendants, make a copy of this page to provide the information for additional defendants.

1. Defendant _West Valley Detention Center, Medical STAFF, SAN Bernardino County SHeriFFs DepartMent_ resides or works at
(full name of first defendant)

_9500 Etiwanda Ave, Rancho Cucamonga, Ca 91739_
(full address of first defendant)   _SAN Bernardino County SHeriffs,_

_Medical STAFF, West Valley Detention Center,_
(defendant's position and title, if any)

The defendant is sued in his/her (Check one or both): ☑individual   ☑official capacity.

Explain how this defendant was acting under color of law: _THe Medical STAFF Ignored My Complaints of Medical Problems in which Symptons Had Worsened into physical Damage of THe Colon, Eye problem, and THyroid problem (Graves disease)_

2. Defendant _____ resides or works at
(full name of first defendant)

_____
(full address of first defendant)

_____
(defendant's position and title, if any)

The defendant is sued in his/her (Check one or both): ☐ individual   ☐ official capacity.

Explain how this defendant was acting under color of law:
_____
_____

3. Defendant _____ resides or works at
(full name of first defendant)

_____
(full address of first defendant)

_____
(defendant's position and title, if any)

The defendant is sued in his/her (Check one or both): ☐ individual   ☐ official capacity.

Explain how this defendant was acting under color of law:
_____
_____

4.  Defendant _____ resides or works at
    (full name of first defendant)

    _____
    (full address of first defendant)

    _____
    (defendant's position and title, if any)

The defendant is sued in his/her (Check one or both):  ☐ individual   ☐ official capacity.

Explain how this defendant was acting under color of law:

_____

_____

5.  Defendant _____ resides or works at
    (full name of first defendant)

    _____
    (full address of first defendant)

    _____
    (defendant's position and title, if any)

The defendant is sued in his/her (Check one or both):  ☐ individual   ☐ official capacity.

Explain how this defendant was acting under color of law:

_____

_____

**D. CLAIMS***

**CLAIM I**

The following civil right has been violated:

My Right to Immediate Medical Attention when it concerns Cancer growth and Blockage of the rectum (colon polyps) Colon Lining damage due to Not Taking Me to My Colonoscopy when it was scheduled, I Feel the Medical Staff (Doctors, Etc...) Were Negligent regarding my requests Also I Kept telling them I was Having problems with number 2 (pooping) and Acquired Several polyps My Liver also Has a Cyst on it That was diagnosed by 2 Doctors, one Said that it was Cancerous, the other Said it wasn't, I Also Asked to Have my eyes Checked Thouroughly and to Be Sent to Arrowhead Regional Medical Center For evaluation But was denied. I explained to them that I Had Laser Surgery done before My Incarceration and Have Macular Degenerative disease And Graves disease Now My Conditioned Has Worsened From Not Having the proper Medical Treatment, I Feel this is Cruel and Unusual punishment, Eighth Amendment

Supporting Facts: Include all facts you consider important. State the facts clearly, in your own words, and without citing legal authority or argument. Be certain you describe, in separately numbered paragraphs, exactly what each DEFENDANT (by name) did to violate your right.

① My First Fact is I was refused My Colonoscopy by Medical Staff (Dr. Leong) I was Constantly Complaining to them that I Had Blockage of the rectum (colon) and was Having a difficult Time doing Number 2 (poop) ② I specifically explained to the Intake Nurse that I Had a Colonoscopy scheduled in March 2014 upon arriving in August of 2013. In which she stated I Had to Wait And ignored my request By Not writing or typing it in the Computer during the duration of That period polyps (Cancerous) developed on My Rectum (colon) and damaged Colon lining I was told by the Doctor at Arrowhead Regional Medical Center That if They Were Bad Polyps He'd Take them out. This Finally Happened in 2015 when I Had them Taken Out. Now I suffer From a damaged Colon and Continuous polyp growth in the Same Region (Colon, Rectum) which Makes it difficult to use And is Constantly irritated and Hurts when going Number 2 poop.

*If there is more than one claim, describe the additional claim(s) on another attached piece of paper using the same outline.

page 5 (Continued)

\* Supporting Facts Continued: Describing in paragraphs what the defendant (By Name) did to Violate My right (Civil).

③ I Tried to Have My eyes Checked For proper prescription and explained to the Eye Doctor that my eyes Need a New prescription. I Had laser Surgery done on Both eyes prior to n Incarceration. I asked the Medical staff to give Me 2 Bottle of eye drops that were needed to Heal my Eyes, But was denied them, I also explained to Him that I wear prescription glasses and He told Me Just to get reading glasses Plus My Window was Covered with Window Frost Which does not let any Sunlight in at all. Now due to all These situations My eyes Have worsened and I see gray and Black spots in which Has developed into Macular degenerative disease.

④ Right to one oF lifes Basic necessities is to use the restroom when needed My toilet in Unit 11 C-Tank C-1 clogged up and was broken For 3 days in which Me and My Cellmate Danny Aguayo were Not allowed to use the dayrooms toilet. This situation was Inhumane, it also Caused Me to Hold My Feces and urine to a long periods oF Amount oF Time in which we used Bages to urinate in and the Clogged toilet to poop IN #2 in which it Caused More damage to the Colon in which is "Cruel and Unusual punishment."

⑤ Here are some reasons that I Feel that are important To My Medical Claim, Please see attached pages For Violation of Civil Rights

Prisoners who bring Federal Civil Right suits should be aware THAT prison STAFF CAN Be sued in, Either thier "individual or official Capacity". the Basic rule is that IF a prisoner is Suing For Money damages the Complaint should state THAT THEY are suing in both Types of relief, then the defendents should be sued IN BOTH "Individual and official Capacities" will v. Michigan Dept of State Police (1989) 491 u.s. 58 [109 s.ct 2304; 105 L. Ed 2d 45]

① Injuries recieved when being given BioMedical Nuclear OR behavioral Research (penal Code §3524) Thyroid Glands, Graves disease

② Failure to Summon Medical Care when there is or should be Knowledge of a Need For Immediate Medical Care (Government Code §§ 844.6(a) and 845.6.)

③ Damage Suffered as a result OF a Breach of Contract: Medical Care (Government Code §§ 844.6(a) and 814.)

④ Inadequate Medical Care Violates the U.S. Constitution Eighth Amendment Prohibition on "Cruel and Unusual punishment." only IF the lack of Care Amounts to "deliberate indifference." to a serious Medical Need. Negligent Medical Treatment alone does Not Violate the Eighth Amendment. Estelle V. Gamble (1976) 429 u.s. 97 [97 s.ct. 285; 50 L. Ed 2d 251] THE Same STANDARD Applies to Mental Health Care, See Coleman V. Wilson (N,D. Cal 1995) 912 F. Supp 1282.

⑤ Bad living Conditions are "Cruel and Unusual punishment" under the Eighth Amendment IF those Conditions Amount to Serious devipration of the Minimal Civilized ⟶

Measures of Lifes Necessities Hudson V. Mcmillian (1992) 503 U.S. 1 [112 S. CT. 995; 117 L. Ed. 2d 156]: Rhodes V Chapman (1981) 452 U.S. 337, 347, [101 S. CT 2392; 69 L. Ed 2d 59.] Sunlight is Blocked on My Window with Frost and Does not allow Sunlight to Come In which Causes strain on the eyes And we dont recieve proper Vitamins and Nutrients From the Sun, which is a God given right. Also Including Bad Sanitation Not Being Able to use The toilet For 3 days/3 nights which Caused More damage to the Colon, STAFF deliberately did Not Let Me (Roberto Fontes) and Danny Aguayo Cellmate use of the dayroom Toilet. Hoptowit V. RAY (9TH CIR 1982) 682 F. 2d 1237, 1246. Wilson V. Seiter (1991) 501 U.S. 294, 302 [111 S. CT. 2321; 115 L. Ed 2d 271.]

## E. REQUEST FOR RELIEF

I believe that I am entitled to the following specific relief:

To Have THe proper Medical Treatment done when requested Also to Be able to use Doctors that were Treating and Tending to My Medical Needs Before My Incarceration I Also Feel that due to gross negligence of all my Medical Conditions that I ask The Honorable Magistrate Judge and the Federal Court to Grant ReliieF OF $1,500,000. one-Million Five-Hundred Thousand Dollars For Future Medical Expenses, and For Mental Anguish that I Have to live with, especially a Damaged Colon lining and possible Cancer. Eye Problem and Thyroid problem. Thank You For Your time and patience.

_____ (Date)

_____ (Signature of Plaintiff)



Roberto E Fowler
1108 1308410002
West Valley Detention Center
9500 Etiwanda Ave
Rancho Cucamonga, CA
91739

CV

ATTENTION! Honorable Magistrate Judge
and pro se clerk
United States District Court
Central District of California
312 North Spring Street, Room G-8
Los Angeles, California
90012

FEB -8 2016

